**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 18 1997**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

JOHN LAWMASTER,

     Plaintiff-Appellant,

v.

P. BLAIR WARD; UNKNOWN
AGENTS OF THE UNITED STATES
TREASURY DEPARTMENT
BUREAU OF ALCOHOL, TOBACCO
AND FIREARMS; UNITED STATES
OF AMERICA,

     Defendants-Appellees.

No. 96-5028

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 93-C-115-H)**

---

Steven L. Sessinghaus, Tulsa, Oklahoma, for Plaintiff-Appellant.

Kathleen Bliss, Special Assistant United States Attorney, Albuquerque, New
Mexico; and Peter Bernhardt, Assistant United States Attorney (Stephen C. Lewis,
United States Attorney, with him on the brief), Tulsa, Oklahoma, for Defendants-
Appellees.

---

Before **BRORBY, LOGAN** and **HENRY**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

John Lawmaster brought this action in the United States District Court for the Northern District of Oklahoma pursuant to *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971) and the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 (1994). Mr. Lawmaster sued defendants P. Blair Ward and other "unknown agents" of the United States Department of the Treasury Bureau of Alcohol, Tobacco and Firearms ("Agents") and sued the United States, seeking to recover damages based on the Agents' conduct during their search of Mr. Lawmaster's house. Mr. Lawmaster appeals the district court's order granting summary judgment in favor of the defendants. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm in part and reverse in part.

## I.

### A. Undisputed Facts

A confidential informant advised Agent Ward of the following: Mr. Lawmaster owned an illegal fully automatic Colt AR-15 machine gun; the informant saw Mr. Lawmaster firing the gun in a fully automatic mode; Mr. Lawmaster carried the machine gun in several different vehicles; Mr. Lawmaster kept the gun in a green military case; and during gun shows, the informant saw Mr. Lawmaster looking at kits to convert a semi-automatic AR-15 into a fully automatic machine gun. Agent Ward contacted the National Firearms

Registration and Transfer Record Office to determine whether Mr. Lawmaster had any firearms registered and concluded he did not. Based on this information, Agent Ward submitted an affidavit and obtained a warrant to search Mr. Lawmaster's home for the following items:

> All types of firearms required to be registered with the Bureau of Alcohol, Tobacco and Firearms in the National Firearms Registration and Transfer Record including, but not limited to the following: Colt, AR-15, .223 caliber machine gun, unknown serial number; any machine gun parts or components, such as sears, hammers, disconnectors or bolts; any tools used in the alteration or modification of firearms, such as files or drills; documents, papers, books, records, and other tangible properties which identify occupants or owners of the property to be searched, including, but not limited to, persons whose name or names appear on utilities, repair bills, documents, books, papers, and any other tangible property referring to the purchase, acquisition, ownership, maintenance, or transfer of any types of firearms and/or all components of the above described firearms required to be registered by Federal Law.

Due to safety concerns, the Agents decided to search Mr. Lawmaster's house while it was unoccupied. Once at the house, the Agents knocked and identified themselves, and when there was no answer, they forced open the front door. Once inside the house, Mr. Lawmaster's and the Agents' version of the facts sharply diverge; therefore, as an aid to context, each version will be set out below.

**B. Facts according to the Agents**

Two affidavits were filed along with the motion for summary judgment: one from Agent Ward, and the other from Dennis Larsen -- a Sergeant with the Tulsa Police Department and the commanding officer of the Tulsa Police Department Bomb Squad. According to Agent Ward's affidavit, once the Agents opened the front door, a vicious dog confronted them, so in an attempt to force the dog into the back yard, the Agents also forced open the back door. In the house, Agent Ward discovered two other dogs, one of which was an older dog that was unable to move and was lying in its own excrement; Agent Ward called the City of Tulsa Animal Control to attend to the dogs.

After notifying animal control, Agent Ward discovered what appeared to be a home-made time bomb on top of a table. *Id*.) Agent Ward evacuated the residence and notified the Tulsa Police Department Bomb Squad. Prior to the Bomb Squad's entry to the house, the gas service was temporarily disconnected to prevent a second source of ignition. Upon his entry into the house as a member of the Bomb Squad, Sergeant Larsen saw the house in total disarray including rotting food on the countertops, piles of dirty clothing on the floor, and dog feces scattered everywhere.

The Bomb Squad x-rayed the bomb-looking object, determined it was

missing a complete firing circuit, and disassembled it to establish it contained no explosives. After the bomb squad concluded the house was free of explosives, the Agents reentered the house to continue the search. Upon reentry, Agent Ward noticed the house had a strong odor of urine and had dog feces, food, firearms, ammunition, clothing, videos and magazines strewn throughout the residence.

During the search, Agent Ward forcibly entered a gun vault and a metal box fitting the informant's description of where Mr. Lawmaster stored the machine gun. In the vault, Agent Ward discovered several firearms including one matching the informant's description. Agent Ward conducted a "field test" on the gun concluding it was not a machine gun; he then returned all the firearms neatly back inside the vault and closed the door. Prior to departing, Agent Ward left a copy of the search warrant and a note stating nothing was seized. He also used a hammer to repair both the front and rear doors so they would shut tightly and lock.

### C. Facts according to Mr. Lawmaster

Mr. Lawmaster filed the sole affidavit in response to the summary judgment motion. He avers the following facts: On the day his house was searched, Mr. Lawmaster's house had two adult Labrador dogs and one puppy, none of which

was vicious; rather, virtually all visitors to the home petted the dogs, and the dogs had never bitten anyone. The dogs were house trained and they seldom had accidents such that before the search, the house was free of stench or feces.

Prior to the search, the house's back door was secured with a "night latch," but could be opened from the inside by turning the door's knob. Dirty dishes were in the "kitchen area," all clean clothes were in the closet or in drawers, and all dirty clothes were in a hamper. All food, videos, firearms, and ammunition were stored, and a few magazines were on the living room coffee table or on end tables. The house contained a paperweight resembling a bomb, an item commonly available at gun shows.

About a dozen of Mr. Lawmaster's firearms were unloaded and stored in the locked gun vault. The following guns were not in the vault: a pistol in a basket in the living room; a pistol in the bedroom night stand; a shotgun attached to the bed's headboard; and an antique shotgun and black powder rifle on a mounted wall rack in the living room. Mr. Lawmaster is not a smoker, and no ashes or dirty ash trays were in the house.

Upon returning home after the Agents' search, Mr. Lawmaster found both

the front and back doors had been forced open and the door jambs had been torn out; the back door was wide open and neither door could be held shut. To Mr. Lawmaster, it appeared dog feces had been tracked through the residence. Magazines and videos had been dumped from their storage areas and were "scattered on the floor and on [the] furniture." All clothes, "clean and dirty, were piled on the floor, under or about upended pieces of furniture, removed drawers and pieces of interior trim which had apparently been removed" by the Agents.

Cigar and cigarette ashes were scattered throughout the house and were "mixed in with the bedding which had been stripped from [the] bed and left in a pile on the floor ... along with the up-ended mattress and box springs." All guns, gun cases, loose ammunition and the cases in which Mr. Lawmaster stored the ammunition were "scattered throughout the house." Mr. Lawmaster's antique shotgun and his black powder rifle were lying on living room furniture. One of Mr. Lawmaster's pistols was "submerged in the dogs' water bowl."

Mr. Lawmaster filed this suit pursuant to *Bivens* alleging the Agents violated his Fourth and Fifth Amendment rights.[1] Also, Mr. Lawmaster asserted

---

[1] In his complaint, Mr. Lawmaster also asserted the Agents made disparaging remarks about Mr. Lawmaster to the neighbors. However, Mr. Lawmaster expressly abandoned any libel or slander claims against the

that through its Agents, the United States committed the torts of trespass, conversion, and intentional infliction of emotional distress.[2]

The Agents filed a motion to dismiss, or alternatively a motion for summary judgment. The United States also filed a motion to dismiss. (Aplt App. at 176.) After hearing argument, the district court converted the United States' motion to dismiss into a motion for summary judgment. The district court entered summary judgment for the Agents on the ground of qualified immunity and entered summary judgment for the United States on the ground Mr. Lawmaster's complaint failed to support any tort action against the United States.

---

government in his Response to Defendant United States' Motion to Dismiss filed in the district court. Accordingly, he does not rely on those facts in support of his arguments on appeal.

[2] In his brief before this court, Mr. Lawmaster raises an additional claim that because the Agents' conduct "amounted to a palpable taking of property without due process of law," the Fifth Amendment provides a claim for relief against the United States for his property loss. This claim was not raised in the complaint, and the district court did not address it. Because Mr. Lawmaster failed to raise the Fifth Amendment claim against the United States in his complaint, we refuse to consider it. *See Charles v. Rice*, 28 F.3d 1312, 1219 (1st Cir. 1994) (affirming a district court's refusal to consider an issue not raised in the complaint). Nevertheless, as explained in more detail below, Mr. Lawmaster fails to show how the Agents committed a "palpable taking" in violation of the Fifth Amendment. Consequently, even if we were to consider the claim's merits as against the United States, it would fail.

On appeal, Mr. Lawmaster argues the district court erred in granting summary judgment in favor of the Defendants because the Agents were not entitled to qualified immunity and because Mr. Lawmaster's complaint and affidavit show the Agents committed torts for which the United States is liable. We consider these arguments in turn.

## II. *Bivens* Claims

### A. Qualified Immunity

In granting summary judgment in favor of the Agents, the district court held the Agents were entitled to qualified immunity on Mr. Lawmaster's Fourth and Fifth Amendment claims. We review the district court's grant of summary judgment based on qualified immunity *de novo*, applying the same legal standard used by the district court. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996).

Summary judgment is appropriate "if the pleadings ... together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. "While the movant bears the burden of showing the absence of a genuine issue of material fact, the movant need not

negate the nonmovant's claim." *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996). If the movant carries this initial burden, the nonmovant must establish a genuine issue of material fact. *Id.* A fact is "material" only if it may affect the suit's outcome. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is "genuine"; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant. *Jenkins*, 81 F.3d at 990.

When performing discretionary functions, government officials are entitled to qualified immunity; in other words, such government officials are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity serves the public by striking a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions. *Id.* at 814, 819. Qualified immunity mitigates costs that society as a whole would otherwise bear such as the expenses of litigation, the diversion of official energy from important public issues, and the deterrence of talented citizens from accepting public office. *Id.* at 814. Thus,

qualified immunity serves to terminate insubstantial lawsuits quickly; however, when government officials abuse their positions, an action for damages may be the only realistic means of enforcing constitutional guarantees. *Id.* Therefore, we will not summarily dismiss claims where a plaintiff shows the officials' conduct violated clearly established law of which a reasonable person should have known. *Id.* at 814, 818.

Once the defendant has properly raised the defense of qualified immunity in a summary judgment motion, we apply a two-part framework. *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996). First, the plaintiff must show the defendant's conduct violated a constitutional or statutory right; second, the plaintiff must show the right the defendant's conduct violated was clearly established such that a reasonable person in the defendant's position would have known the conduct violated the right. *Id.*; *Anderson v. Creighton*, 483 U.S. 635, 638-40 (1987); *Harlow*, 457 U.S. at 818-19. Unless the plaintiff makes such a showing, the defendant prevails. In considering whether the plaintiff makes such a showing, we view the evidence in the light most favorable to the plaintiff. *See, e.g.*, *Davis v. Gracey*, 111 F.3d 1472, 1478 (10th Cir. 1997); *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 645-46 (10th Cir. 1988). Once the plaintiff clears this hurdle, "the defendant assumes the normal

summary judgment burden of establishing that no material facts that would defeat his claim for qualified immunity remain in dispute." *Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992), *cert. denied*, 509 U.S. 923 (1993). The question of whether the defendants are entitled to qualified immunity is a legal one; this court cannot avoid the question by framing it as a factual issue. *Pueblo*, 847 F.2d at 646. With this framework as guidance, we turn to Mr. Lawmaster's claims.

**1. Fourth Amendment**

**a. Has Mr. Lawmaster averred sufficient fact to establish a Fourth Amendment violation?**

Mr. Lawmaster asserts the Agents violated his right to be free from unreasonable searches and seizures under the Fourth Amendment. More specifically, Mr. Lawmaster asserts the Agents' conduct violated his Fourth Amendment rights because the warrant issued was an unconstitutional "general warrant," and because the warrant was not supported by probable cause to the extent it allowed the Agents to search for parts used to convert a gun into a machine gun. We hold these claims are without merit.

First, the warrant was not a "general" warrant. The Fourth Amendment requires that a search warrant describe the things to be seized with a sufficient

degree of particularity such that nothing is left to the officer's discretion as to what is to be seized and such that the executing officer is prevented from generally rummaging through a person's belongings. *Gracey*, 111 F.3d at 1478. Here, the warrant directed the Agents to search for and seize "[a]ll types of firearms required to be registered with the Bureau of Alcohol, Tobacco and Firearms in the National Firearms Registration and Transfer Record," along with "any machine gun parts or components, such as sears, hammers, disconnectors or bolts; any tools used in the alteration or modification of firearms, such as files or drills." The warrant's description of property the Agents were permitted to search for and seize was sufficiently narrow to proscribe a general exploratory search of Mr. Lawmaster's home. Therefore, the warrant was not unconstitutionally over broad, and Mr. Lawmaster's assertion to the contrary is without merit.

Second, the warrant was supported by probable cause. The issuing judge's task is to make a common sense decision whether the totality of the evidence supports the conclusion there is a fair probability that contraband or evidence of a crime will be found. *United States v. Cusumano*, 83 F.3d 1247, 1250 (10th Cir. 1996). This is a determination to which we give "great deference" such that we ask only whether the issuing magistrate had a "substantial basis" for determining probable cause existed. *Id.* The affidavit filed in support of the search warrant

-13-

stated that a confidential informant relayed the following to the affiant: Mr. Lawmaster owned an unregistered machine gun; the informant had seen Mr. Lawmaster transport and fire the machine gun; the informant had seen Mr. Lawmaster carrying the gun in several different vehicles; the informant observed Mr. Lawmaster looking at several gun shows for a kit to convert a semi-automatic Colt into a fully automatic machine gun; Mr. Lawmaster stored the gun in a green gun case. The affidavit relating the informant's detailed, eye-witness account of the alleged illegal activity together with the investigating officer's verification that Mr. Lawmaster had never registered any firearms provided a "substantial basis" for the magistrate's conclusion there was a fair probability that contraband or evidence of a crime would be found, and the machine gun parts fall within the warrant's well-defined borders. Consequently, the warrant to search Mr. Lawmaster's home was amply supported by probable cause, and properly allowed the Agents to search for machine gun parts.

Mr. Lawmaster's attempt to separate the machine gun parts from the other items the warrant identified such that the parts required an independent showing of probable cause is similarly rejected. The affidavit provided probable cause that evidence of a crime would be found in Mr. Lawmaster's home, and the

"evidence" of the crime included machine gun parts. Consequently, the warrant properly included machine gun parts within its scope.

Assuming the legality of the warrant, Mr. Lawmaster also argues the Agents unreasonably executed the search warrant in violation of the Fourth Amendment for the following reasons: 1) once they learned the gun described by the informant was not an illegal machine gun, the Agents' unreasonably relied on the search warrant, and unreasonably continued the search; and 2) in executing the search warrant, the Agents unnecessarily and unreasonably ransacked Mr. Lawmaster's home. As discussed, we first determine whether Mr. Lawmaster has shown the Agents' conduct violated the Fourth Amendment. *Garramone*, 94 F.3d at 1449. In considering these claims, we view the evidence in Mr. Lawmaster's favor.

Mr. Lawmaster argues the Agents should have realized the warrant lacked probable cause and should have immediately halted their search after discovering the gun the informant described was not an illegal machine gun; therefore, Mr. Lawmaster argues, the search of his home was unreasonable in violation of the Fourth Amendment. We disagree.

Agents conducting a search are entitled to rely, in good faith, on a magistrate's determination of probable cause. *United States v. Williams*, 897 F.2d 1034, 1038-39 (10th Cir. 1990), *cert. denied*, 500 U.S. 937 (1991). As we have stated, probable cause existed permitting the Agents to search Mr. Lawmaster's home for the objects listed in the warrant. Whether evidence of a crime is actually found in the home is irrelevant to the issue of whether probable cause existed to search. Here, the Agents did not act unreasonably in continuing their search even after discovering the first Colt AR-15 .233 caliber gun they found was not an illegal machine gun. The illegal gun could have been hidden somewhere else in the house. We hold the Agents did not act unreasonably, and did not violate Mr. Lawmaster's Fourth Amendment right by continuing to search after discovering the Colt AR-15 .233 caliber gun was not an illegal machine gun.

Mr. Lawmaster also argues the Agents unreasonably ransacked his home in violation of the Fourth Amendment. Although the Constitution does not specifically address how an officer should execute a search warrant, a warrant that is reasonably executed will withstand constitutional scrutiny. *See Dalia v. United States*, 441 U.S. 238, 257 (1979). The Fourth Amendment provides individuals with security in their homes, and a search warrant, even one properly supported and properly issued, is not a license to breach that security with

impunity. An officer's conduct in executing a search is subject to the Fourth Amendment's mandate of reasonableness from the moment of the officer's entry until the moment of departure. *Duncan v. Barnes*, 592 F.2d 1336, 1338 (5th Cir. 1979). However, so long as the officer's conduct remains within the boundaries of reasonableness, an officer has discretion over the details of how best to proceed with a search warrant's execution. *See Dalia*, 441 U.S. at 257. Occasionally, such details include damaging property, detaining residents, or taking action necessary to protect the searching officers. *Id.* at 258; *Michigan v. Summers*, 452 U.S. 692, 705 (1981); *Bills v. Aseltine*, 958 F.2d 697, 704 (6th Cir. 1992). However, because the touchstone of the constitutionality of an officer's conduct during a search is reasonableness, when executing a search warrant, an officer is limited to conduct that is reasonably necessary to effectuate the warrant's purpose. *Ayeni v. Mottola*, 35 F.3d 680, 689 (2d Cir. 1994), *cert. denied*, 514 U.S. 1062 (1995); *Ginter v. Stallcup*, 869 F.2d 384, 388 (8th Cir. 1989); *Tarpley v. Greene,* 684 F.2d 1, 9 (D.C. Cir. 1982).

We note that whether an officer's conduct is reasonable is a highly fact-dependent inquiry that can only be determined on a case-by-case basis. *See Tarpley*, 684 F.2d at 9. Essentially then, we look to the totality of the circumstances to determine whether the officer's conduct was reasonably

necessary to effectuate the warrant's purposes. *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993) ("Under the Fourth Amendment, the intrusiveness of a search or seizure will be upheld if it was reasonable under a totality of the circumstances.") However, in the context of evaluating a qualified immunity defense, the purpose of which is not only to shield the defendant from liability, but also from the burdens of trial, we cannot defer to trial the question of whether a defendant is entitled to qualified immunity simply by framing the question as a factual one; rather, we must evaluate the totality of the circumstances to determine, as a matter of law, whether the plaintiff has stated sufficient facts to show the defendants violated his or her constitutional rights. *Pueblo*, 847 F.2d at 645-46. Where we address the issue of qualified immunity in the summary judgment context, the plaintiff must present some evidence to support the allegations; mere allegations, without more, are insufficient to avoid summary judgment. *Ginter*, 869 F.2d at 388.

Mr. Lawmaster specifically argues, based on facts averred in his sworn affidavit, that by leaving a pistol submerged in the dog's water bowl, and by spreading cigar and cigarette ashes throughout his home and bedding, the Agent's acted unreasonably and in violation of the Fourth Amendment. Viewing the

evidence in Mr. Lawmaster's favor, as we must in the summary judgment context, we agree.

Considering the totality of the circumstances, we are unable to hold the Agents' conduct of leaving Mr. Lawmaster's gun in a dogs' water bowl and leaving cigar and cigarette ashes in his bedding was reasonably necessary to carry out the warrant's purpose to search for and seize a machine gun and parts. The Constitution protects individuals from the arbitrary intrusion by the police. It is a right that is at the core of the Fourth Amendment, and it is one that is basic to a free society. *Coolidge v. New Hampshire*, 403 U.S. 443, 453 (1971). When officers obtain a warrant to search an individual's home, they also receive certain limited rights to occupy and control the property; however, the Fourth Amendment binds the officers such that the right to search a home concomitantly obliges the officers to do so in a reasonable manner. Accepting Mr. Lawmaster's averred facts as true, we hold the Agent's conduct of leaving cigar and cigarette ashes in Mr. Lawmaster's bedding and leaving Mr. Lawmaster's pistol in the dogs' water bowl transcends what is reasonable conduct under the circumstances of this

case; consequently, we hold Mr. Lawmaster has stated facts sufficient to show the Agents violated Mr. Lawmaster's Fourth Amendment rights.[3]

### b. Has Mr. Lawmaster satisfied his burden of showing the conduct violated clearly established law?

As stated, the doctrine of qualified immunity attempts to strike a balance between the need to vindicate a private individual's constitutional rights through a claim for damages and the need to mitigate the societal costs resulting from such claims. As a result, a plaintiff faced with the defense of qualified immunity not only bears the burden of showing the officer's conduct violated the Constitution, but also bears the burden of showing the officer's conduct violated law that was "clearly established" such that a reasonable officer would have known the conduct violated the asserted right. *Anderson*, 483 U.S. at 638-40.

---

[3] To the extent Mr. Lawmaster argues the Agents acted unreasonably in breaking of the locks on the gun vault, we disagree. Here, because the Agents had to examine the contents of the gun vault, such conduct was reasonably necessary to carry out the purposes of the warrant and did not violate Mr. Lawmaster's Fourth Amendment rights. Also, we note that while Mr. Lawmaster averred the Agent's scattered his belongings, broke down his doors, tracked feces throughout the house, summoned the media, and disconnected the gas to his home, Mr. Lawmaster chose to focus only on the Agents' conduct with regard to the pistol in the water bowl and the cigar and cigarette ashes in support of his argument the Agents acted unreasonably in searching his home for an illegal machine gun and parts. Consequently, we render no decision as to the necessity or reasonableness of the remaining alleged conduct.

Certainly, the right to be free from unreasonable searches and seizures is one the Constitution has "clearly established"; however, as the Supreme Court has explained, "if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*," and would not reasonably allow officials to anticipate when their actions may give rise to liability for damages. *Anderson*, 483 U.S. at 639. Consequently, it is the plaintiff's burden to establish the asserted right's contours are sufficiently clear such that a "reasonable official would understand that what he is doing violates that right." *Id.* at 640.

Qualified immunity does not protect official conduct simply because the Supreme Court has never held the exact conduct at issue unlawful. Rather, the shield of qualified immunity is pierced if in light of pre-existing law, the unlawfulness of the conduct is apparent to the officer. *Id.* "This ordinarily means that there must be a Supreme Court or Tenth Circuit opinion on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Garramone*, 94 F.3d at 1451.

We hold the law mandating officers act reasonably while conducting a search was sufficiently well established at the time of the Agents' search of Mr.

Lawmaster's home such that the Agents should have known their conduct transgressed Mr. Lawmaster's Fourth Amendment rights. We certainly recognize that in order for a plaintiff to show the law is clearly established, it is not enough for the plaintiff to make general allegations that an officer's conduct was "unreasonable" in violation of the Fourth Amendment. Applying the test of "clearly established law" at this level of generality would be contrary to *Harlow*'s touchstone of "objective legal reasonableness." *Anderson*, 483 U.S. at 639. Rather, the asserted right's contours must be sufficiently well-defined such that a "reasonable official would understand that what he is doing violates that right." *Id.* at 640.

However, where the reasonableness inquiry necessarily turns on the cases' particular facts such that the reasonableness determination must be made on an ad hoc basis, we must allow some degree of generality in the contours of the constitutional right at issue. We would be placing an impracticable burden on plaintiffs if we required them to cite to a factually identical case before determining they showed the law was "clearly established" and cleared the qualified immunity hurdle. Thus, as we stated in *Garcia v. Miera*, 817 F.2d 650, 657 (10th Cir. 1987), *cert. denied*, 485 U.S. 959 (1988), we adopt the approach of "'requiring some but not precise factual correspondence in demanding that

-22-

officials apply general, well developed legal principles'" (quoting *People of Three Mile Island v.Nuclear Regulatory Comm'rs*, 747 F.2d 139, 144 (3d Cir. 1984)). While qualified immunity was meant to protect officials performing discretionary duties, it is should not present an insurmountable obstacle to plaintiffs seeking to vindicate their constitutional rights.

Therefore, while it is true there are no decisions expressly prohibiting officers from leaving guns submerged in water or prohibiting officers from leaving cigar or cigarette ashes in a home, it is well established the Fourth Amendment is in place to preserve the sanctity of the home to the largest extent consistent with the reasonable exercise of law enforcement duties. *Ayeni*, 35 F.3d at 686*; Ginter*, 869 F.2d at 388. Concomitantly, the law is well established officers may only engage in conduct that reasonably furthers the purpose for which they are in the home; those officers who execute a warrant in an unreasonable manner violate the Constitution. *Bills v. Aseltine*, 958 F.2d 697, 704 (6th Cir. 1992); *Hill v. McIntyre*, 884 F.2d 271, 277 (6th Cir. 1989); *Tarpley*, 684 F.3d at 8-9; *Duncan v. Barnes*, 592 F.2d 1336, 1338 (5th Cir. 1979). As stated, the test here is whether the law is sufficiently well-defined such that a "reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. We conclude no reasonable officer in the position of

the Agents in this case would believe that leaving a gun submerged in a water bowl, and leaving ashes in bedding was reasonably necessary to the search for a machine gun and parts. Consequently, giving credence to Mr. Lawmaster's version of the facts, we hold Mr. Lawmaster the Agents' are not entitled to summary judgment based on qualified immunity.

### 2. Fifth Amendment

Mr. Lawmaster argues that in the event no remedy exists under the Fourth Amendment or the Federal Tort Claims Act, he is entitled to relief under the Fifth Amendment. Notably, in his complaint, Mr. Lawmaster does not contend the Agents deprived him of property in violation of his substantive due process rights; rather, he contends the Agents' destruction of his property "amounted to a taking without due process of law." The Fifth Amendment provides, in pertinent part, that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. Mr. Lawmaster fails to allege any facts showing how his property was taken for public use in violation of the Fifth Amendment. Because Mr. Lawmaster fails to show how the Agents' conduct

violated his right to be free from unconstitutional takings, the Agents are entitled

to qualified immunity on the Fifth Amendment claim.[4]

---

[4] To the extent Mr. Lawmaster attempts to amend his claim to one of deprivation of property in violation of his Fifth Amendment right to substantive due process, we refuse to consider it as it was not raised in his complaint. *See Charles*, 28 F.3d at 1319. Even if we were to liberally construe Mr. Lawmaster's complaint as one alleging the Agents deprived him of property in violation of his Fifth Amendment right to substantive due process, we note such a claim would fail. First, after *Graham v. Connor*, 490 U.S. 386 (1989), and *Albright v. Oliver*, 510 U.S. 266 (1994), it is doubtful whether a plaintiff may pursue a claim under *Bivens* due to an alleged violation of substantive due process based on the same facts as alleged in a Fourth Amendment unreasonable search claim. *See Ayeni*, 35 F.3d at 691.

In *Graham*, the Supreme Court stated a plaintiff's claim of an unconstitutional seizure by an officer is properly analyzed under the Fourth Amendment standard rather than under a substantive due process standard. 490 U.S. at 388. The Court explained: "Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Id.* at 395. Later, in *Albright*, relying on *Graham*, a plurality of four justices expanded *Graham*'s holding to all claims of constitutional violation. 510 U.S. at 273. (plurality opinion). Justice Souter seemed to provide a fifth vote for this proposition. *Id.* at 287 ("the concept of due process [should not be] reduced to the mere duplication of protections adequately addressed by other constitutional provisions.").

Second, even if we were to recognize such a claim here, the Agents would be entitled to qualified immunity since the alleged destruction of the door jams, the paper weight, locks securing a gun vault, and a small lock box, was reasonably necessary to execute the search warrant's purpose. *See Tarpley*, 684 F.2d at 9*; Pueblo*, 847 F.2d at 647 (defendants entitled to qualified immunity from Fourth and Fifth Amendment claims due to reasonableness of search and seizure).

### III. Federal Tort Claims Act

Mr. Lawmaster argues the United States is liable for torts the Agents committed during the search including trespass, conversion, and intentional infliction of emotional distress under the Federal Tort Claims Act. We review the district court's grant of summary judgment *de novo*. *Kaul*, 83 F.3d at 1212.

The Federal Tort Claims Act waives the United States' sovereign immunity when federal employees are negligent within the scope of their employment under circumstances in which private individuals would be liable. 28 U.S.C. §§ 2674, 1346(b). Because we determine the United States' liability "in accordance with the law of the place where the act or omission occurred," Oklahoma law dictates our decision. 28 U.S.C. § 1346(b).

#### A. Trespass

According to Oklahoma law, a trespass involves an unauthorized "actual physical invasion of the property of another." *Fairlawn Cemetery Ass'n v. First Presbyterian Church*, 496 P.2d 1185, 1187 (Okla. 1972). However, the courts of Oklahoma have considered police officers trespassers only where they have entered property without proper legal authority to do so. *See Brinlee v. Oklahoma*, 403 P.2d 253, 256 (Okla. Crim. App. 1965) (because the officer's

searched the property without a warrant, "they entered as trespassers"); *Combs v. State*, 233 P.2d 314, 317 (Okla. Crim. App. 1951) (entry into garage was pursuant to "a void search warrant and was therefore a trespass on the part of the officers"). In its definition of "legal authority" to enter property, the Oklahoma courts have included entry pursuant to a "valid search warrant issued by a magistrate having jurisdiction based upon an affidavit sufficient on its face to show probable cause." *Brinlee*, 403 P.2d at 255. The warrant permitting the Agents to search Mr. Lawmaster's home fit Oklahoma's definition of "legal authority" such that the officers were not trespassers. Consequently, applying Oklahoma law, we hold Mr. Lawmaster has failed to state sufficient facts to avoid summary judgment against him on his claim of trespass.

Also, for the first time on appeal, Mr. Lawmaster attempts to argue the doctrine of *trespass ab initio* should apply to the Agents' conduct, and argues the question whether Oklahoma would recognize such a doctrine should be remanded to the district court. According to *Black's Law Dictionary,* under the doctrine of *trespass ab initio*, one who enters property with privilege may become a trespasser "from the beginning" if the subsequent conduct constitutes trespass by an abuse of such privilege. *Blacks Law Dictionary* 1347 (5th ed. 1979). We have serious doubts as to whether Oklahoma would recognize the doctrine;

-27-

nevertheless, because Mr. Lawmaster failed to raise the issue in the district court, we invoke our general rule that we will not consider a new issue for the first time on appeal. *See Walker v. Mather (In re Walker)*, 959 F.2d 894, 896 (10th Cir. 1992). Further, we refuse to remand to the district court a question that should have been raised in the first instance; doing so would subvert the policies the general rule is in place to protect, including the doctrines of finality and conservation of judicial resources. This we refuse to do.

### B. Conversion

Mr. Lawmaster also asserts the Agents' "substantial interference" with his personal property rights constituted a conversion. Under Oklahoma law, a conversion is "'any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein.'" *Installment Fin. Corp. v. Hudiburg Chevrolet, Inc.*, 794 P.2d 751, 753 (Okla. 1990) (quoting *Steenbergen v. First Federal Savings & Loan of Chickasha*, 753 P.2d 1330, 1332 (Okla. 1987)); *see also*, *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir. 1994). Oklahoma has interpreted "dominion" as implying "'both title and possession and appears to require complete retention of control over disposition.'" *Installment*, 794 P.2d at 753 (quoting *Eastex Aviation, Inc. v. Sperry & Hutchinson Co.*, 522 F.2d 1299, 1305 (5th Cir. 1975)).

In the summary judgment context, it is the nonmovant's burden to present facts sufficient to support a reasonable jury determination in his or her favor. *Jenkins*, 81 F.3d at 990. Here, Mr. Lawmaster has failed to allege facts sufficient to support a reasonable jury determination the Agents exerted "dominion," or "both title and possession and ... complete retention of control" over his property. Consequently, the United States is entitled to summary judgment on Mr. Lawmaster's conversion claim.

### C. Intentional Infliction of Emotional Distress

In Oklahoma, to establish a prima facie case of intentional infliction of emotional distress, a plaintiff is required to show: "(1) the tortfeasor acted intentionally or recklessly; (2) the tortfeasor's conduct was extreme and outrageous; (3) plaintiff actually experienced emotional distress; and (4) that the emotional distress was severe." *Anderson v. Oklahoma Temp. Servs., Inc.*, 925 P.2d 574, 575 (Okla. Ct. App. 1996); *see also, Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1377-78 (Okla. 1978).

Even if we assume Mr. Lawmaster has established the first two prongs of this test, he has failed to carry his burden on the second two. In neither his complaint nor in his affidavit does Mr. Lawmaster allege he has actually

experienced severe emotional distress.  Consequently, the United States is entitled to summary judgment on this claim.[5]

Accordingly, we **REVERSE** the district court's grant of summary judgment in favor of the Agents, **AFFIRM** the district court's grant of summary judgment in favor of the United States, and **REMAND** this case to the district court for further proceedings consistent with this opinion.[6]

---

[5] Because we affirm the district court's grant of summary judgment based on the Federal Tort Claims Act claims' merits, we need not consider whether the discretionary function exception to liability found in 28 U.S.C. § 2680(a) applies.

[6] On August 13, 1997, the Defendants-Appellees filed documents with this court suggesting Mr. Lawmaster is now deceased and requesting us to suspend appellate proceedings pursuant to Fed. R. App. P. 43(a).  As we have received no confirmation of death or request to substitute parties pursuant to Fed. R. App. P. 43(a), and as the rule imposes no deadline on a request to substitute parties, we have determined to proceed in filing this opinion.