UNITED STATES COURT OF APPEALS
**Filed 11/15/96**
FOR THE TENTH CIRCUIT

COVAL D. THOMAS,

    Plaintiff-Appellant,

  and

VELMA JEAN ATKINSON,
KENNETH W. THOMAS, CYNTHIA
MUSE,

    Plaintiffs,

v.

CITY OF SNYDER, OKLAHOMA, a
municipal corporation; LARRY ROE,
City of Snyder Chief of Police in his
individual and official capacity,

    Defendants-Appellees.

No. 95-6252
(D.C. No. CIV-94-23-A)
(W.D. Okla.)

ORDER AND JUDGMENT*

Before PORFILIO, LOGAN, and LUCERO, Circuit Judges.

---

\*     This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Plaintiff Coval Thomas appeals the district court's grant of summary judgment in favor of defendants, the City of Snyder and Larry Roe its Chief of Police, on plaintiff's civil rights claims based on false arrest and malicious prosecution.[1] The district court determined that Roe was entitled to qualified immunity because plaintiff failed to establish the violation of a constitutional right, and that the City was not liable because Roe's actions "were not the result of deliberation nor is there any evidence that his actions were part of any policy of violating constitutional rights." Appellant's App., doc. D at D16. We affirm in part, reverse in part, and remand for further proceedings.[2]

---

[1] In the district court, plaintiff also alleged false imprisonment and due process violations arising from the conditions of his pretrial confinement. Plaintiff does not appeal the adverse disposition of these claims, nor do his mother, brother, or sister appeal the adverse disposition of their claims against defendants.

[2] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34 (f) and 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

# I

In April 1992 plaintiff was involved in an altercation at a federal housing project in Snyder, Oklahoma. Defendant Roe arrived at the scene in response to a citizen's report that a woman, later identified as plaintiff's mother, was brandishing a gun. Many of the events that transpired after Roe arrived are in dispute.

According to plaintiff's deposition testimony, by the time Roe arrived the altercation had ended. Plaintiff was standing, unarmed, at the side of a car talking to his mother, Velma Jean Atkinson, who was in the driver's seat of the car. Roe pulled up near the car and got out with his gun drawn and held in the air. Roe first walked over to Billy Muse and plaintiff's brother, Kenneth Thomas, who were standing some distance away, arguing. Plaintiff heard Muse cursing at Roe, telling him to leave them alone and to go see about the woman in the car, who had a gun. Roe then left Thomas and Muse and walked to the rear of plaintiff's mother's car, where he called out her name. Plaintiff, who had not seen Roe approach, then looked up and saw Roe standing there with his gun pointed toward plaintiff. Plaintiff immediately turned and put his hands up, saying "'Whoa, Chief!'" Appellant's App., doc. E at E23. Meanwhile, plaintiff's mother turned to look at Roe and, when she saw his pointed gun, sped away in her car. Roe then told plaintiff he was under arrest. About this time plaintiff's sister,

Cynthia Muse, came over and began questioning Roe about why he was arresting plaintiff. Roe then arrested Cynthia Muse and, when Thomas walked over, Roe arrested him as well. Roe then walked over to his car, opened the door, and told the three to get in the car, which they did. Other witnesses corroborated pertinent portions of plaintiff's testimony.

Roe, on the other hand, related quite a different version of events in his police report and in his deposition. He stated that after arriving at the scene he saw plaintiff's mother attempting to hide a gun. Having been informed previously that she had been brandishing the gun in a threatening manner, Roe approached her car, told her that she was under arrest, and instructed her to get out of the car. At that time Thomas and plaintiff walked up. Thomas stepped in front of Roe, preventing him from grabbing the gun, and plaintiff stepped forward to prevent Roe from arresting plaintiff's mother. Roe claims that plaintiff was carrying a machete and that Thomas was armed with a lug wrench. While plaintiff and Thomas were interfering with Roe, plaintiff's mother sped off, driving over Roe's foot. Plaintiff then backed up a few feet and raised the machete. At that point, Roe drew his gun for the first time, held it in the air, and instructed plaintiff to drop the weapon. Roe then arrested plaintiff and Thomas, who immediately began arguing with Roe, cursing and screaming. Although plaintiff and Thomas

attempted to walk away from Roe at first, plaintiff eventually got in Roe's car without a physical struggle.

Plaintiff was later charged with disturbing the peace (Okla. Stat. tit. 21, § 1362), obstructing an officer (Okla. Stat. tit. 21, § 540), and carrying a weapon (machete) (Okla. Stat. tit. 21, § 1272). Plaintiff's trial began in March 1993, but the prosecutor ultimately dismissed all charges, citing "uncooperative witness" as the reason. Appellant's App., doc. T at T1.

We review the district court's grant of summary judgment de novo, to determine whether there is any genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law. See Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 796 (10th Cir. 1995). "When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Id. (citation omitted). When reviewing a summary judgment decision involving qualified immunity, we use a somewhat different process than when reviewing other summary judgment rulings. See Hannula v. City of Lakewood, 907 F.2d 129, 130 (10th Cir. 1990).

> To reach the question of whether a defendant official is entitled to qualified immunity, a court must first ascertain whether the plaintiff has sufficiently asserted the violation of a constitutional right at all. This requires the district court to first determine whether plaintiff's

allegations, if true, state a claim for a violation of a constitutional right that was clearly established when defendant acted. . . .

In order to carry his burden, . . . the plaintiff must articulate the clearly established constitutional right and the defendant's conduct which violated the right with specificity, and demonstrate a substantial correspondence between the conduct in question and prior law . . . establishing that the defendant's actions were clearly prohibited. Unless such a showing is made, the defendant prevails. Once the plaintiff has sufficiently alleged the conduct violated clearly established law, then the defendant bears the burden, as a movant for summary judgment, of showing no material issues of fact remain that would defeat the claim of qualified immunity.

Romero v. Fay, 45 F.3d 1472, 1475 (10th Cir. 1995) (quotations and citations omitted).

II

With the above principles in mind, we turn first to plaintiff's false arrest claim against Roe in his individual capacity. The Fourth Amendment guarantee of an individual's right not to be arrested without probable cause was clearly established long before plaintiff's arrest. Beck v. Ohio, 379 U.S. 89, 91 (1964). An arrest without a warrant is proper as long as the arresting officer has probable cause to believe that the arrestee has committed a crime. Romero, 45 F.3d at 1476. Roe would be "entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest" plaintiff. Hunter v. Bryant, 502 U.S. 224, 228 (1991). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the

-7-

arrestee has committed or is committing an offense." Jones v. City & County of Denver, 854 F.2d 1206, 1210 (10th Cir. 1988). Thus, the existence of probable cause depends on the reasonableness of Roe's conduct under the particular circumstances presented.

As our earlier recitation illustrates, much of the evidence about the events leading to plaintiff's arrest is disputed. The district court, however, apparently concluded that none of these factual disputes were material. Instead, the court relied on, as dispositive of plaintiff's claim, the court's belief that plaintiff admitted he was carrying a weapon and was involved in a fight before Roe's arrival, and that Roe saw plaintiff with a machete. Appellant's App., doc. D at D9. We have problems with this analysis.

First, even if we assume that plaintiff's conduct before Roe arrived formed at least part of the basis for plaintiff's arrest, the record reflects a factual dispute as to whether, at the time he arrested plaintiff, Roe knew about plaintiff's earlier conduct. Second, both Roe's police report and statements in his appellate brief establish that he did not arrest plaintiff for his earlier conduct. Instead, Roe arrested plaintiff for the conduct Roe observed while he was attempting to arrest plaintiff's mother and seize her gun. See Appellant's App., doc. Q; Appellees' Answer Brief at 8. Further, the Appellant's Appendix does not contain any admission by this plaintiff that he possessed a weapon at any time on the day at

issue (April 10, 1992), and defendants have not filed a supplemental appendix to bring to our attention any other evidence that might have been before the district court. See 10th Cir. R. 30.2.

When viewed in the light most favorable to plaintiff, the events preceding his arrest would not lead a reasonable officer to conclude that probable cause existed to arrest plaintiff under any of the criminal statutes under which plaintiff was charged.[3] Therefore, because plaintiff established facts which, if proved,

_____

[3]    At the time of plaintiff's arrest, Okla. Stat. tit. 21, § 1362 made it unlawful for anyone to

> willfully or maliciously disturb, either by day or night, the peace and quiet of any city of the first class, town, village, neighborhood, family or person by loud or unusual noise, or by abusive, violent, obscene or profane language, whether addressed to the party so disturbed or some other person, or by threatening to kill, do bodily harm or injury, destroy property, fight, or by quarreling or challenging to fight, or fighting, or shooting off any firearms, or brandishing the same, or by running any horse at unusual speed along any street, alley, highway or public road.

Okla. Stat. tit. 21, § 540, in turn, made it unlawful for anyone to "willfully delay[] or obstruct[] any public officer in the discharge or attempt to discharge any duty of his office." Finally, Okla. Stat. tit. 21, § 1272 made it unlawful for

> any person to carry upon or about his person, or in his portfolio or purse, any pistol, revolver, dagger, bowie knife, dirk knife, switchblade knife, spring-type knife, sword cane, knife having a blade which opens automatically by hand pressure applied to a button, spring, or other device in the handle of the knife, blackjack, loaded cane, billy, hand chain, metal knuckles, or any other offensive weapon, except as in this article provided.

(continued...)

-9-

would demonstrate a violation of clearly established law, the district court erred in granting summary judgment to Roe on plaintiff's claim based on false arrest.

III

In analyzing plaintiff's malicious prosecution claim under 42 U.S.C. § 1983, we "take[] the common law elements of [the tort] as the 'starting point' . . . , but always reach[] the ultimate question . . . of whether the plaintiff has proven a constitutional violation. . . . [I]n the § 1983 malicious prosecution context, that constitutional right is the Fourth Amendment's right to be free from unreasonable seizures." Taylor v. Meacham, 82 F.3d 1556, 1561 (10th Cir. 1996), cert. denied, 65 U.S.L.W. 3229 (U.S. Oct. 7, 1996)(No. 96-211); see also Albright v. Oliver, 510 U.S. 266, 272-73 (1994) (holding that the Fourth Amendment, rather than substantive due process, is the source of the constitutional protection at issue in a claim for malicious prosecution).

The elements of a claim for malicious prosecution under Oklahoma law are as follows: "(1) the bringing of the original action by the defendant; (2) its successful termination in favor of the plaintiff; (3) want of probable cause to bring the action; (4) malice; and (5) damages." Parker v. City of Midwest City, 850 P.2d 1065, 1067 (Okla. 1993). As Justice Ginsburg noted in her concurring

---

[3](...continued)

opinion in Albright, suing a police officer under a malicious prosecution theory is "anomalous," because "[t]he principal player in carrying out a prosecution--in 'the formal commencement of a criminal proceeding'--is not police officer but prosecutor." Albright, 510 U.S. at 279 n.5 (Ginsburg, J., concurring) (quoting id. at 295 (Stevens, J., dissenting)). Likewise, although an officer's arrest without probable cause may set in motion a malicious prosecution, the "'chain of causation'" will usually be broken by a subsequent assessment of probable cause through an indictment or a preliminary hearing. Taylor, 82 F.3d at 1564 (quoting Reed v. City of Chicago, 77 F.3d 1049, 1053 (7th Cir. 1996)).

Nonetheless, we have held that a police officer who "purposefully conceal[s] and misrepresent[s] material facts to the district attorney which may have influenced his decision to prosecute" is not insulated by the prosecutor's actions in initiating or continuing the prosecution as an intervening break in the chain of causation. Robinson v. Maruffi, 895 F.2d 649, 655 (10th Cir. 1990). The prosecutor's actions under such circumstances are not independent from, but rather dependent on, the police officer's wrongful conduct. Id. at 656; see also Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial--none of these decisions will shield a police

officer who deliberately supplied misleading information that influenced the decision.").

Here plaintiff alleged in his complaint that Roe presented "fabricated, false, distorted, misrepresented and perjurious evidence [] to the Kiowa County District Attorney's Office in order to bring about a trial and/or conviction" for crimes plaintiff did not commit. Appellant's App., doc. A at A10. The only information before us that Roe provided to the prosecution was his police report. Although plaintiff disputes the recitation of events contained in that report, the prosecutor's letter to plaintiff's counsel in the criminal case summarizing the anticipated witness testimony generally corroborates Roe's version of events. Because nothing in the record suggests that these corroborating witness summaries were not a product of the prosecutor's independent investigation, the record does not present a triable issue of fact as to whether Roe purposely provided false or misleading information to the prosecutor. Therefore, the district court properly granted summary judgment to Roe on plaintiff's claim for malicious prosecution.

IV

A municipality can be held liable for a constitutional violation under 42 U.S.C. § 1983 only when "action pursuant to official municipal policy of some nature caused a constitutional tort. . . . [A] municipality cannot be held liable solely because it employs a tortfeasor--or, in other words, a municipality cannot

be held liable under § 1983 on a respondeat superior theory." Monell v. Department of Social Servs., 436 U.S. 658, 691 (1978). "'[O]fficial policy' often refers to formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986). However, an isolated decision by a municipal official that is not intended to control future decisions can, nonetheless, give rise to municipal liability under appropriate circumstances. Id.

Specifically, when a municipal official who is "responsible for establishing final policy with respect to the subject matter in question" makes "a deliberate choice to follow a course of action . . . from among various alternatives," municipal liability will attach to that decision. Id. at 483-84; see also Starrett v. Wadley, 876 F.2d 808, 818 (10th Cir. 1989) ("[I]f a county official has been delegated the power to make final policy in an area of the county's business, then the official's acts in that area are the acts of the county."). Thus, the key inquiry in determining whether municipal liability attaches to an official's actions is whether that official has the policymaking authority necessary to make his acts those of the municipality.

"[W]hether a particular official has 'final policymaking authority' is a question of *state law*." City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988).

"[S]tate law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." Id. at 125. In determining where state law places the authority to make final policy, we must keep in mind that authority to make a final decision is distinct from authority to make final policy. "'[R]esponsibility for making law or setting policy'--the objective under Praprotnik of our search through local law--is authority to adopt rules for the conduct of government. Authority to make a final decision need not imply authority to establish rules." Auriemma v. Rice, 957 F.2d 397, 401 (7th Cir. 1992); see also Jett v. Dallas Indep. Sch. Dist., 7 F.3d 1241, 1246 (5th Cir. 1993).

> The fact that a particular official--even a policymaking official--has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

Pembaur, 475 U.S. at 481-83 (citation omitted). "If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability." Praprotnik, 485 U.S. at 126.

In Pembaur, the Court recited the following example to illustrate the difference between a discretionary decision that constitutes an act of the

-14-

municipality and one that does not: If a sheriff, who was a final policymaker regarding law enforcement activities, were given discretion by the county's board of commissioners to hire and fire department employees but the board retained the authority to establish county employment policy, the sheriff's exercise of discretion in employment matters would not give rise to county liability, even if he exercised his discretion in an unconstitutional manner. Pembaur, 475 U.S. at 483 n.12. On the other hand, the sheriff's decisions in the area of law enforcement activities--where he was a final policymaker--would give rise to municipal liability. Id. In Praprotnik, the Court provided further guidance by setting forth the following principles:

> [T]he authority to make municipal policy is necessarily the authority to make *final* policy. When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

485 U.S. at 127.

With the foregoing principles in mind, we turn to the issue of municipal liability presented here. First, we note that our earlier determination that plaintiff failed to establish a triable issue of fact on his claim for malicious prosecution

-15-

against Roe forecloses plaintiff's malicious prosecution claim against the City. See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (holding that city could not be held liable based on unconstitutional policy if police officer's actions did not inflict constitutional harm). Therefore, we are concerned only with the City's potential liability for plaintiff's alleged false arrest.

In concluding that no municipal liability attached for plaintiff's arrest, the district court did not focus on whether Roe, as the chief of police, had authority to make final policy for the City concerning warrantless arrests, or law enforcement activities in general. Instead, the court noted the particular circumstances under which Roe arrested plaintiff and concluded that, under those circumstances, the decision to arrest "did not involve a policy, as the term is commonly understood." Appellant's App., doc. D at D17. The court contrasted "[t]he process of arresting a criminal suspect [which] involves 'split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving'" with a decision to terminate an employee (like that in Praprotnik), which is "made under circumstances allowing for deliberation and contemplation, in other words, a policy decision as it is commonly understood." Id. at D16-17 (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). The district court's approach has appeal but is, nonetheless, erroneous.

-16-

First, the only qualification that the Supreme Court has placed on the type of decision from which "an unconstitutional governmental policy could be inferred," Praprotnik, 485 U.S. at 123, is that the decision must represent "a deliberate choice to follow a course of action . . . made from among various alternatives," Pembaur, 475 U.S. at 483. If such a decision is made by an official who has the authority to establish final policy in the particular subject area, then the decision will give rise to municipal liability, id. at 483-84, even if the decision is "tailored to a particular situation and [is] not intended to control decisions in later situations," id. at 481. Thus, for example, the county prosecutor's instructions to the deputy sheriffs in Pembaur to "'go in and get'" employees presumed to be inside a locked business premises, without a search warrant, id. at 472-73, were held to be acts of the county, because the county prosecutor had authority to establish final county policy regarding law enforcement practices, id. at 484-85. See also Morgan v. City of DeSoto, 900 F.2d 811, 815 (5th Cir.) (holding that if police chief, as city policymaker, directed arrests regardless of whether facts supported probable cause to arrest, then city would be liable), cert. denied, 498 U.S. 940 (1990). Cf. Frost v. Hawkins County Bd. of Educ., 851 F.2d 822, 828 (6th Cir.) (holding that police chief's arrest of plaintiff, even if without probable cause, did not give rise to municipal liability

-17-

because evidence showed that police chief did not have authority to make final policy on police matters), cert. denied, 488 U.S. 981 (1988).

Second, the district court's approach injects an unwanted element of uncertainty into the determination of municipal liability. By focusing on the particular circumstances under which the decision was made, the degree of deliberation or consideration involved, and then assessing whether the decision constituted "a policy, as the term is commonly understood," Appellant's App., doc. D at D17, municipalities cannot readily predict when they may incur liability. Just as "[m]unicipalities cannot be expected to predict how courts or juries will assess their 'actual power structures,'" Praprotnik, 485 U.S. at 124 n.1, they cannot be expected to predict how a court or jury will assess the degree of deliberation involved in an official's decision and its resemblance to what that fact finder considers a "policy." The approach outlined in Pembaur and Praprotnik, in contrast, provides more certainty because municipalities know which officials legally exercise final policymaking authority.

We note Roe's own testimony that he was the policymaker for his department. See Appellant's App., doc. F at F2. Nevertheless, the record before us is not sufficient to determine whether, as a matter of state and local law, Roe had final policymaking authority regarding law enforcement activities in general

or warrantless arrests in particular. Therefore, we must remand the issue of municipal liability to the district court for further consideration.

V

In summary, the district court correctly concluded that plaintiff did not present a triable issue on his claim for malicious prosecution, and therefore properly granted summary judgment to Roe in his individual capacity and to the City on this claim. The district court, however, erred in granting summary judgment to Roe in his individual capacity and to the City on plaintiff's claim arising out of the alleged false arrest. The conflicting evidence in the record demonstrates the existence of material issues of fact as to whether a reasonable officer would believe he had probable cause to arrest based on plaintiff's conduct that Roe observed. The City may be liable on this claim if Roe had final policy-making authority in this area and if Roe's actions resulted in a constitutional violation.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

Entered for the Court


James K. Logan
Circuit Judge


-19-